IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| CHRISTINE DEMPSEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:09CV790-SRW |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Christine Dempsey brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner on plaintiff's Title II claim is due to be affirmed and, further – to the extent plaintiff contends that her Title XVI claim is at issue – that the court lacks jurisdiction over plaintiff's appeal as to her Title XVI claim.

**No Final Decision of the Commissioner as to Title XVI Claim**

On February 27, 2006, plaintiff filed an application for a period of disability and disability insurance benefits alleging that she became disabled on July 1, 2002. (R. 80, Block 3; R. 105-09). At the same time, she filed an application for Supplemental Security Income.

(R. 110-14). On June 10, 2006, Beverly Holt, Single Decisionmaker ("SDM"), issued a decision denying plaintiff's Title II claim. (R. 80, Disability Determination and Transmittal (see Blocks 7 and 8); R. 81-85 (Form SSA-L443-U3 ("RETIREMENT, SURVIVORS, AND DISABILITY INSURANCE Notice of Disapproved Claim")); Cf. POMS DI 26535.031 (Form SSA-L443-U3 is used for initial denial of Title II claims, Form SSA-L434-U3 is used for initial denial of Title XVI claims and, where the basis for initial denial is the same for concurrent Title II and Title XVI claims, Form SSA-L442-U3 is used); POMS NL 00603.001, ¶ B(4)(same); R. 86 (Explanation of Determination form noting "Type of Claim" as "INDIB"). The record before the court includes no decision on plaintiff's Title XVI claim.

The basis cited by the SDM for denying plaintiff's Title II claim – *i.e.,* that her restrictions did not preclude her from performing her past work as a bookkeeper – would also have justified denial of plaintiff's Title XVI claim.[1] The SDM's failure either to use the single form for notifying the claimant of initial denial as to both claims on the same basis or to use separate forms denying each claim might not bar review of the Commissioner's Title XVI decision if, in subsequent administrative proceedings, the parties had otherwise treated the denial as pertaining to both claims. However, this did not occur. On December 1, 2006, when plaintiff requested a hearing before an ALJ, "V. Smith," a Social Security Administration worker, completed the bottom half of the hearing request form. In Block 15,

---

[1] Plaintiff's Title XVI claim might instead have been denied on some alternative basis unrelated to plaintiff's ability to work – *e.g.*, if the plaintiff had unearned income in an amount sufficient to render her ineligible for SSI. Although the record before the court includes plaintiff's Title XVI application, it does not include any evidence indicating whether or why plaintiff's Title XVI claim was denied.

which states "Check all claim types that apply[,]" the worker placed an "X" in the box indicating "Title II Disability – worker or child only (DIWC)[.]"[2] (R. 87, Form HA-501-U5, Block 15; see also R. 170, Form SSA-3367 completed by Smith ("The Presumptive Disability page details are not being displayed here because there is no SSI claim on this case."). In October 2007 and July 2008, plaintiff completed forms designating Georgia Ludlum and other attorneys at Ludlum's firm as her representatives. Although the appointment forms include blocks for indicating the type of claim, none of the blocks were marked by plaintiff or her attorneys. (R. 98-103). Ludlum, on March 26, 2008, requested a fully favorable decision in an on-the-record review pursuant to 20 C.F.R. § 404.948,[3] indicating the type of claim as "DIB[.]" (R. 179, 181). The ALJ did not grant Ludlum's request for a favorable decision on the record; instead, by notice dated July 23, 2008, he scheduled a hearing for August 19, 2008. (R. 72-76). In that notice – under the heading "Issues I Will Consider In Your Case" – the ALJ advised plaintiff (and her attorney, by a copy of the correspondence) that "[t]he hearing concerns your application of February 27, 2006, for a period of disability and Disability Insurance Benefits under sections 216(i) and 223(a) of the Social Security Act (Act).[4]  I will decide if you have enough earnings under

---

[2] The form included an alternate option of "SSI Disability/Title II (SSDC)[.]" (R. 87). However, neither the Disability Determination and Transmittal (R. 80) nor the Notice of Disapproved Claim with accompanying explanation (R. 81-86) would have put Smith on notice that plaintiff was requesting a hearing on a Title XVI claim.

[3] For Title XVI cases, the applicable regulatory provision is 20 C.F.R. § 416.1448.

[4] Sections 216(i) and 223(a) of the Social Security Act (42 U.S.C. §§ 416(i), 423(a)) pertain to a "period of disability" and disability insurance benefits, respectively.

Social Security to be insured for Disability Insurance Benefits. If you do, I must decide if you became disabled while insured." (R. 73, 75). The ALJ's notice further stated – under the heading "If You Have Objections" – that "[i]f you object to the issues I have stated, or to any other aspect of the scheduled hearing, you must tell me in writing why you object. You must do this at the earliest possible opportunity before the hearing." (R. 74). There is no evidence of record that plaintiff filed any written objection to the ALJ's statement of the issues. The ALJ opened the August 19, 2008 hearing by stating, again without objection by plaintiff or her attorney, that "Ms. Dempsey is appealing the denial of her claim for a Period of Disability and Disability Insurance Benefits." (R. 25).

On November 14, 2008, the ALJ issued a decision bearing a heading indicating that the decision related to plaintiff's claim for "Period of Disability and Disability Insurance Benefits" (R. 12). The ALJ did make some findings as to plaintiff's condition through the date of his decision. (See R. 18 (finding RFC through the date of the decision); R. 22 (finding that plaintiff was not under a disability at any time from the alleged onset date through the date last insured or "through the date of this decision")). However, it is clear that the ALJ rendered a decision only on the Title II claim. (See R. 12 ("After careful consideration of all the evidence, the undersigned Administrative Law Judge concludes the claimant was not under a disability within the meaning of the Social Security Act from July 1, 2002 through the date last insured."); R. 14 (Step 1 and Step 2 findings through the date last insured); R. 17 (Step 3 finding through the date last insured); R. 19 (reasoning that Dr. Janush's opinions regarding plaintiff's physical limitations were consistent with other

evidence of plaintiff's physical condition before the date last insured)).

Plaintiff appealed the ALJ's decision to the Appeals Council; the Social Security Administration worker who accepted the appeal form, Rhonda Bowden, also treated plaintiff's appeal from the hearing decision as one relating to a claim solely for worker's disability benefits. (R. 7, ¶ 12, marking only the box for "Disability-Worker (DIWE)"). After the Appeals Council denied review, plaintiff sought review in this court, invoking the jurisdiction of the court "pursuant to 42 U.S.C. § 405(g)." (Doc. # 1, ¶ 1). In her complaint, she did not cite 42 U.S.C. § 1383(c)(3), the statutory provision which authorizes judicial review of the Commissioner's decisions on Title XVI claims.[5]

In her brief before this court, however, plaintiff argues that she "seeks judicial review of the final administrative decision of the Commissioner of Social Security denying her claim for Social Security Disability Insurance benefits ("SSDI") *and Supplemental Security Income (SSI)*." (Doc. # 14, p. 1)(emphasis added). Her discussion of the administrative processing of her case – and her arguments on the merits – suggest that plaintiff believes that the ALJ's unfavorable decision was rendered on her SSI claim, as well as her Title II claim. (Id., p. 2). For the reasons stated above, the court concludes that it was not. The court's authority to review the Commissioner's decision in Title XVI claims extends only to "final

---

[5] 42 U.S.C. § 1383(c)(3) incorporates § 405(g) by reference. It states that "[t]he final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

determination[s] of the Commissioner of Social Security after a hearing[.]" 42 U.S.C. § 1383(c)(3). The administrative hearing in this case – and the final determination of the Commissioner – did not pertain to plaintiff's Title XVI claim. Accordingly, to the extent plaintiff seeks review of any decision denying her SSI claim, this court may not entertain plaintiff's appeal. See Weinberger v. Salfi, 422 U.S. 749 (1975).[6]

### Title II Claim

Plaintiff was born on September 19, 1970, and earned an associate degree in business administration in 1994. She previously worked as the assistant manager for a livestock barn, the district manager of carriers for a newspaper, a bookkeeper, the manager of a convenience store in Pennsylvania, and a cashier at a convenience store in Enterprise. Plaintiff last worked as the store manager of a Movie Gallery store; she was terminated from this position in February 2002, when she returned to work after being hospitalized and on bed rest for two weeks due to numbness in her leg. (R. 30-31, 35-36, 139-47, 163, 169, 186-87). On February 27, 2006, plaintiff filed an application for a period of disability and disability insurance benefits alleging that she became disabled on July 1, 2002 due to pain in her neck which subsequently spread to her lower back and hips. (R. 80, Block 3; R. 105-09, 131). After a hearing conducted on August 19, 2008, the ALJ issued a decision in which he concluded that – through September 30, 2006, her date last insured – plaintiff had severe impairments of "[l]umbar spinal stenosis, degenerative disc disease of the cervical spine, and history of

---

[6] The record before the court suggests no exception to the general rule requiring a final determination, and no waiver of the requirement by the Commissioner. In its brief before this court, the Commissioner treats plaintiff's appeal as pertaining only to a Title II claim. (See Doc. # 15).

cervical laminectomies[,]" but that she did not have an impairment or combination of impairments that met or medically equaled an impairment in the listings and that she retained the residual functional capacity to perform her past relevant work as a manager/assistant manager, bookkeeper, and cashier, as those jobs are generally performed in the national economy. (R. 12-22). He concluded, therefore, that plaintiff was "not under a disability within the meaning of the Social Security Act from July 1, 2002 through the date last insured." (R. 12).

## Standard of Review

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

**Discussion**

<u>Opinions of Treating Physicians</u>

Plaintiff argues that the ALJ failed to evaluate the opinions of her treating physicians properly and, therefore, that he erred in finding that she retains the residual functional capacity for light work. Specifically, she contends that the ALJ erred in rejecting Dr. Janush's opinion that plaintiff's "pain and other symptoms would be severe enough to 'frequently' interfere with the 'attention and concentration needed to perform even simple work tasks.'" and Dr. Smith's opinion that plaintiff is "'severely limited in [her] ability to walk[.]'" (Doc. #14 at pp. 6-10, citing R. 198, 516; <u>see also</u> Plaintiff's Reply Brief, Doc. # 19, pp. 1-3)**.** As to Dr. Smith, the evidence cited by plaintiff is plaintiff's application to the Motor Vehicle Division of the Alabama Department of Revenue for disability access parking privileges. (R. 198). According to the application, disability access placards may be issued to someone with a disability which limits or impairs his or her ability to walk, and individuals with a long-term disability must receive a physician's certification of the disability for the first five-year period. (<u>Id</u>.). Dr. Smith signed plaintiff's application, checking the blocks to indicate that she has a long-term disability – specifically, that she is "[s]everely limited in [her] ability to walk due to an arthritic, neurological, or orthopedic condition." (<u>Id</u>.). Neither plaintiff nor Dr. Smith dated the form; however, the application indicates that Dr. Smith's certification is for the first five-year period of parking access, from January 1, 2007 to December 31, 2012. Dr. Janush of the Center for Physical Medicine & Pain Management in Montgomery initially evaluated plaintiff on August 16, 2007. A year later, Dr. Janush

completed a physical residual functional capacity questionnaire and a physical capacities evaluation form. (R. 514-17). As plaintiff argues, Dr. Janush marked the block "frequently" in response to the question, "How often during a typical workday is your patient's experience of pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks?" (R. 516).

Plaintiff contends that, because the ALJ failed to articulate his reasons for rejecting the attention and concentration limitation imposed by Dr. Janush and Dr. Smith's certification on the disability parking access application, the opinions expressed by Dr. Janush and Dr. Smith must be accepted as true. The vocational expert testified at the hearing that all work is precluded for an individual whose pain or other symptoms are severe enough to interfere with the attention and concentration needed to perform even simple tasks. (R. 69-70). Plaintiff argues, accordingly, that if Dr. Janush's attention and concentration limitation is accepted as true, plaintiff must be found to be disabled. She further contends, citing SSR 83-10, that Dr. Janush's and Dr. Smith's opinions conflict with the ALJ's conclusion that she has the residual functional capacity for light work.

Even assuming error on the part of the ALJ in considering this evidence from Dr. Janush and Dr. Smith, such error does not warrant an award of benefits or remand. Dr. Janush rendered her opinion on August 18, 2008, nearly two years after plaintiff's date last insured. Although Dr. Janush responds, within the questionnaire, that plaintiff's "impairments lasted or can . . . be expected to last at least twelve months[,]" (R. 514), there is nothing in the questionnaire or the accompanying PCE form to suggest that plaintiff's

limitations existed at the level indicated by Dr. Janush at any time before the expiration of plaintiff's disability insured status. Therefore, even credited fully, Dr. Janush's opinion does not apply to the period at issue in this Title II claim.

The same is true of Dr. Smith's opinion. While it was rendered closer in time to the end of plaintiff's disability insured status than was Dr. Janush's opinion, it still applies, on its face, to the period beginning on January 1, 2007 – three months after plaintiff's date last insured. Additionally, since the disability parking access application does not define "severely limited" or "disability" – the form leaves interpretation of the terms to the physician's discretion[7] – Dr. Smith's opinion simply cannot be compared directly with the walking and standing requirements of light work.[8] Accepted as true, the opinions of Dr. Janush and Dr. Smith do not warrant either an award of benefits or remand. Accordingly, even if the ALJ erred in his treatment of these opinions, the error was harmless.

## Plaintiff's Depression

Plaintiff points to evidence that: (1) she was treated by Dr. Smith, her primary care physician, with a prescription for Zoloft in June 2000, after she told him she had been "depressed and under a lot of stress at work" (R. 284); (2) ten months later, in April 2001, because of her "chronic depression on and off[,]" her "recent depression symptoms," and her success with Zoloft in the past, Dr. Smith again started plaintiff on Zoloft (R. 278); (3) on

---

[7] The form refers to information on its reverse side; however, the reverse side of the form was not included in the record. (See R. 198).

[8] See Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005)(finding that the ALJ's failure to indicate the weight he gave to the opinions of certain physicians was harmless error, because those opinions did not directly contradict the ALJ's findings).

August 2, 2001, Dr. Smith continued plaintiff's prescription for Zoloft (R. 277); (4) Dr. Janush, on August 18, 2008, indicated in the physical residual functional capacity questionnaire that plaintiff suffered from depression secondary to chronic pain (R. 516)[9]; and (5) plaintiff indicated in an undated form she completed for purposes of her appeal of the initial decision that she was then taking Wellbutrin prescribed by Dr. Janush for depression.[10] (See Plaintiff's brief, Doc. # 14, at pp. 10-11)(citing R. 185, 277, 278, 284, and 516). During a consultative physical examination on June 5, 2006, plaintiff denied consulting a psychiatrist or psychologist, and also denied memory loss, speech problems and change in behavior. (R. 391). Plaintiff contends that the ALJ erred by: (1) not completing a PRTF or following its mode of analysis in assessing her depression; (2) failing to consider her diagnosis of depression (he did not mention her depression at all); and (3) failing to order a consultative psychological examination. (Plaintiff's brief, pp. 10-14).

Plaintiff's alleged onset date is July 1, 2002. Her date last insured was September 30, 2006. The evidence cited by plaintiff demonstrates that she was treated by her primary care physician with Zoloft in June 2000 for depression. There is no mention in Dr. Smith's notes for office visits in July 2000, November 2000 or January 2001 of depression (or Zoloft). On

---

[9] However, Dr. Janush also marked "No" in response to the immediately preceding question on the form, "Do emotional factors contribute to the severity of your patien'ts symptoms and functional limitations?" (R. 516).

[10] Dr. Janush's treatment notes indicate that she first prescribed Wellbutrin for the plaintiff on March 3, 2008. Her note states, "Pt. would like rx for Wellbutrin to help stop smoking has been on in past. Pt is depressed with weight gain as well." (R. 510; see also R. 459). Dr. Smith's treatment note for an office visit on November 1, 2001 indicates that plaintiff said she had started smoking again and that she had "been on Wellbutrin before which has seemed to work." Dr. Smith prescribed Wellbutrin for smoking cessation on that date. (R. 276).

April 24, 2001, he restarted plaintiff on Zoloft for depression; in August 2001, he continued her prescription. (R. 280-85). However, by November 1, 2001 – eight months before her alleged onset date – plaintiff was no longer on Zoloft and was requesting Wellbutrin for smoking cessation. (R. 276). Dr. Janush first prescribed Wellbutrin – at plaintiff's request for smoking cessation and because she was "depressed" about her weight gain – on March 3, 2008, over seventeen months after plaintiff's date last insured. Plaintiff points to no diagnosis of or treatment for depression at any time during the period at issue and the court has found no such evidence in the record.

      Where a claimant has presented a colorable claim of mental impairment, the ALJ is required to complete a Psychiatric Review Technique Form and append it to his decision or, in the alternative, incorporate its mode of analysis into the written decision. Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005). The court concludes that plaintiff has not presented a colorable claim that she suffered from a mental impairment during the period of time relevant to her Title II claim and, accordingly, that the ALJ did not err by failing to evaluate plaintiff's diagnoses of depression. See Dixon v. Astrue, 2010 WL 4942141, **8-10 (N.D. Fla. Oct. 26, 2010), *Report and Recommendation adopted,* 2010 WL 4929045 (N.D. Fla. Nov. 30, 2010)(no colorable claim of mental impairment where plaintiff's physician – who was not a mental health provider – diagnosed anxiety and prescribed Xanax for a limited and non-continuous portion of the relevant time period); id. at 10 n. 14 (listing cases). In the absence of even a colorable claim of mental impairment, the ALJ did not need a consultative psychological examination to make an informed decision on plaintiff's claim

and, accordingly, he did not err by failing to order one. See Ingram v. Commissioner of Social Sec. Admin., 496 F.3d 1253 (11th Cir. 2007)("Although the ALJ generally has an obligation to develop the record, the ALJ did not err by failing to inquire into Ingram's mental capacity. Even though Social Security courts are inquisitorial, not adversarial, in nature, claimants must establish that they are eligible for benefits. The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision.")(citing Doughty v. Apfel, 245 F.3d 1274, 1281 (11th Cir. 2001)).

Side Effects of Medication

Plaintiff argues that the ALJ erred in failing to consider the side effects of the morphine she takes three times daily. (Plaintiff's brief, Doc. # 14. p. 15). At the administrative hearing, plaintiff testified that she had been taking morphine for "[a]pproximately a year and a half" – *i.e.*, since early 2007. (R. 23, 43). Plaintiff's counsel provided records to the ALJ to show that plaintiff "received prescriptions for Morphine Sulfate as early as April 5, 2007[.]" (R. 200, counsel's post-hearing correspondence to ALJ; R. 195-96, pharmacy records). Dr. Smith's records indicate that plaintiff was taking Morphine Sulfate by December 31, 2006 (R. 500); however, when plaintiff reported to Dr. Crawford in June 2006, she did not list morphine among her medications (R. 389). The court has found no indication in the record that plaintiff was taking morphine at any time before her date last insured. Since plaintiff offered no evidence that she was taking morphine

during the relevant period, the ALJ was not obligated to consider the side effects of morphine.

## Plaintiff's Fibromyalgia

Plaintiff argues that the ALJ erred by failing to find that her fibromyalgia is severe and in failing to evaluate the effects of the diagnosis on plaintiff's residual functional capacity. (Plaintiff's brief, p. 16). Plaintiff was first diagnosed with fibromyalgia by Dr. LaCour in 1997. (See R. 253). In January 2002, plaintiff sought treatment from Dr. B. Roger Williams complaining primarily of pain and numbness in her legs and left arm and, also, some tenderness of the neck and shoulder musculature. She told him of her previous diagnosis of fibromyalgia, but also said that "her current pains are different than the fibromyalgia problems." (R. 202, 209-10). Dr. Williams admitted plaintiff to the hospital for testing; his discharge diagnosis was "[b]ilateral venous incompetence of lower extremities, no evidence of phlebitis[.]" (R. 207). Under the heading, "Other Diagnosis," Dr. Williams listed fungal infection of the feet, degenerative changes of feet (left worse than right), leg pain and left arm pain due to musculoskeletal inflammation, and "[f]ibromyalgia at her baseline." (R. 207; see also R. 218). In May 2002, a neurologist, Dr. Clifton, evaluated plaintiff for the first time. He noted, "She has a diagnosis of fibromyalgia given by Dr. LaCour about five years ago. She is followed by Dr. Smith for this and seems to do well regarding the fibromyalgia." (R. 253). Dr. Clifton was concerned that plaintiff's symptoms were caused by cervical disc disease (id.) but, in a follow-up appointment on July 10, 2002 – after a negative cervical MRI (R. 249) and normal SSEP (somatosensory evoked potential) study of plaintiff's upper

14

extremities, without evidence of conduction defects (R. 251) – Dr. Clifton noted that plaintiff's chronic body pain was "most likely fibromyalgia." (R. 252).

Dr. Smith, plaintiff's primary care physician, continued to assess fibromyalgia and prescribed medication in six office visits between September 2002 and May 2003. (R. 269-73, 359). In mid-July 2003, plaintiff was admitted to a hospital in Chicago for cervical decompression (a partial laminectomy at C4, C5, C6 and C7) to treat cervical myelopathy. (R. 311-13). A month later, in a follow-up visit to her surgeon, Dr. Heffez, plaintiff reported resolution or improvement in "virtually all" of her symptoms, including fatigue, with "[t]he only persistent pain [being] some coccygeal pain." (R. 314).[11] Plaintiff's surgical wound, however, had become infected. (Id.). Plaintiff returned to Alabama, where Dr. Samuel Sawyer irrigated, repacked, redressed and otherwise treated plaintiff's wound almost daily until September 8, 2003. (R. 329-41). However, plaintiff's wound healed only superficially. Plaintiff then returned to Chicago, where Dr. Heffez performed surgical wound exploration and packing, under general anesthesia. Dr. Heffez found no remaining infection but did find some granulation tissue and a few pieces of ligamentous tissue loose within the wound, which he surmised may have acted as a foreign body preventing full resolution of the wound

---

[11] In her initial consultation with the surgeon, Dr. Heffez, plaintiff had reported "a long history of widespread pain and bladder dysfunction as well as fatigue" and said that she had developed some additional symptoms of "pain in the neck, above the scapula, in the interscapular space, down both arms, in the lower back and in the left more than the right leg." (R. 318). She also described paresthesias and numbness in the forearm, left leg and right foot, and facial numbness and paresthesias. She reported a one year history of occipital headache. She reported longstanding fatigue, which she described as "both a sleepiness and sense of physical weakness[,]" and she told Dr. Heffez that she had been diagnosed with fibromyalgia. (R. 318).

infection. Dr. Heffez debrided the wound, curetted the granulation tissue, and packed the wound, leaving it open for later closure after consultation with plastic surgery. (R. 324-25). On September 17, 2003, Dr. John Lease surgically closed the wound, securing trapezious muscle flaps into the wound. (R. 326-27). On September 26, 2003, plaintiff's sutures were removed in Dr. Sawyer's office; no signs of infection were noted. (R. 329).

Plaintiff continued to seek treatment from Dr. Smith, her primary care physician, for various complaints. In notes for office visits over the next three years and three months, through December 2006, Dr. Smith listed fibromyalgia only in the "past medical history" section of his treatment notes. (R. 349-58, 500). Plaintiff saw Drs. Nortick and Herrick of the Center for Pain of Montgomery between November 2005 and March 2006 (R. 374-82) and again on August 6, 2007 (R. 519-20); their notes indicate plaintiff's "pain problems" as cervical degenerative disc disease and radiculitis and "failed back [cervical]." Although fibromyalgia is one of the possible selections on the printed notes, neither doctor circled it or otherwise referenced fibromyalgia in their treatment notes. (R. 374-81; see also R. 39). In March 2007, plaintiff again sought treatment from Dr. Smith complaining of back pain; he again assessed fibromyalgia and he referred her to Dr. Janush. (R. 498). However, on the intake questionnaire plaintiff completed for Dr. Janush in August 2007, plaintiff wrote that she was seeking treatment due to "surgery – infection." She explained, "Had med laminectomy – got infected – had to remove infected tissue." (R. 449). She noted that her pain, which was located in her neck, lower back and left hip, started with "surgery." (R. 450). Dr. Janush's note for the initial examination describes plaintiff's chief complaint

as "pain status post cervical laminectomy with severe infection and complications of infection re: surgery." (R. 444).

At the administrative hearing before the ALJ on August 19, 2008, plaintiff did not mention fibromyalgia. Instead, when the ALJ asked her what was wrong with her and why she was unable to work, she explained, "Five years ago I had back surgery that was supposed to take care of the numbness in my arms and the legs and the headaches. And I ended up with a massive infection where they had to go in and take out part of the muscles and ligaments in my back and royally messed me up. I live in constant pain." (R. 37). She testified that the doctors had ignored her telephone calls about the infection in her back and that:

> it ended up that they went in and cut straight into my back at the doctor's office without even numbing me because the infection was so bad. I went every day for a month to a local surgeon while they packed my back with wads of cotton that had antiseptic on it. And in that time they reopened it at least four different times because the outside would heal but the inside wouldn't. And after that I got to spend two weeks in Chicago and go through two more procedures where they cut out my back, my muscles, my ligaments, and apparently bone that they didn't bother to share with me.
>
> \* \* \* \* \*
>
> I have constant pain in my lower back. I have constant pain in my neck. If I try to, if I get stressed out at the least bit the muscles where they're supposed to pull straight across your back on a normal person, mine aren't there so they pull straight up on my dormer [sic]. And I get massive headaches, deliberating [sic] headaches where I just lay in bed for however long until they're gone.

(R. 39-41). Plaintiff further testified that Dr. Janush had sent her for test results "that show where I have permanent nerve damage in my neck. I have carpal tunnel in my left and right

17

arm. ... And that there's bone missing ... somewhere in my neck. ... Because that's how we found ... that [Heffez] messed me up even worse than we thought." (R. 41-42).

Plaintiff's counsel explained to the ALJ that:

> [h]er records are really fascinating as far as from the stance. She went for a long period of time without them being able to find out what was wrong. And when she did go ... to Chicago they found that she had stenosis in her neck but it was a mechanical. If she tilted her head a certain way her reflexes would be abnormal and this was throughout her body. So they found out that she had compression on the dorsal spine and that's what they operated on. And she had success initially until she developed the infection.

(R. 44). Plaintiff testified that the thing that causes her the "most problems" is that, if she stands too long, "the back muscles start to cramp up. If I'm under a lot of stress, as I said before, when they cut out the muscle and ligament going across my back ... where a normal person has the muscles that go straight across their back where like if you're under stress you would just tighten up straight across, I don't get that. Mine goes straight up my neck and then pulls on the derma." (R. 59).

Plaintiff now comes before the court arguing that the ALJ erred by failing to include fibromyalgia among her severe impairments and in failing to consider its symptoms – particularly fatigue – in reaching his conclusion regarding her residual functional capacity.[12]

---

[12] At the hearing, plaintiff was represented by Georgia Ludlum. Another attorney from Ludlum's office, Anna Ludlum Chambers, signed plaintiff's brief in this appeal. (See R. 23, 25, 101; Doc. # 14, p. 19; Doc. # 19, p. 5). The brief reflects a somewhat cursory review of the record – plaintiff's counsel argues that plaintiff's fibromyalgia causes fatigue relying, in part, on records which show that plaintiff had a positive mono titer and that Dr. Smith diagnosed plaintiff's fatigue to have resulted from a "[m]ono relapse," and records which do not attribute plaintiff's fatigue to fibromyalgia. (See Plaintiff's brief at p. 17; R. 283-85, 350, 384-86). Additionally, plaintiff's counsel includes a long list of pages of the medical record to demonstrate plaintiff's "extensive history of fibromyalgia." (Plaintiff's brief, pp. 16-17). Some of the cited pages, however, do not evidence a separate instance of diagnosis of fibromyalgia but refer instead to earlier diagnoses or past history (see R. 244, 250); other listed pages are duplicates of records already included in

(R. 16-19). However, plaintiff's medical records from Chicago – reporting relief from "virtually all" of her symptoms, including fatigue, after the cervical decompression – suggest that plaintiff's earlier problems were not (as Dr. Smith and Dr. Clifton apparently thought) due to fibromyalgia. Plaintiff's attorney advised the ALJ that plaintiff's physicians had not been able to find out what was wrong with plaintiff until the doctors in Chicago discovered the "mechanical" stenosis in plaintiff's neck, with dorsal compression of the spinal cord, and that the surgical cervical decompression was a success until plaintiff's wound became infected.

The ALJ concluded that, through the date last insured, plaintiff had the severe impairments of "[l]umbar spinal stenosis, degenerative disc disease of the cervical spine, and history of cervical laminectomies." (R. 14). In view of the representations of plaintiff's counsel to the ALJ at the hearing and the evidence of record (including plaintiff's testimony), the ALJ did not err in his analysis of plaintiff's fibromyalgia.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner on plaintiff's Title II claim is supported by substantial evidence and proper application of the law and, accordingly, that it is due to be affirmed. A separate judgment will be entered.

DONE, this 28th day of January, 2011.

---

the list. (See e.g., R. 269 and 360; R. 270, 361 and 362; and R. 271 and 363).

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE